May it please the court, my name is William Janago and I represent the petitioner appellant Kristen Rossum. I'd like to reserve two minutes of my time for rebuttal. There are at least five reasons why a reasonably competent criminal defense lawyer would have conducted forensic investigation in this case as to the cause of death. The first reason is the very unusual break in the chain of custody. Let me ask you one question to put the argument in the framework. Do you agree that unless we reach the conclusion that you're starting out with, that it was ineffective performance not to conduct the test, that then we don't reach a discovery issue? That's correct. Okay. I believe that's right. So what we really need to decide here basically is ineffective performance. That's right. I believe that's correct. And I think there are at least five reasons, as I started to indicate, that why a reasonably competent lawyer here would have had cause to conduct a forensic investigation of the cause of death. The first one is the 36-hour break in the chain of custody, which is highly, highly unusual, particularly with these kinds of specimens. The second reason is that we know from the record that someone actually had access to the samples during that 36-hour period. In other words, they were left in an open lab. Someone came in, unscrewed the top. There were not permanent seals on them, so someone could actually look at them. That person, who was an alleged co-conspirator in this case, actually examined the contents during that 36-hour period and break in chain of custody. The third reason I think a lawyer would have been on notice here to conduct forensic investigation is that you have the very unusual circumstance of the samples being sent out to three different labs, and what comes back are markedly different concentration levels. There was one lab that came back with, for example, Associated Pathologist Laboratories, detected a concentration level of 128 nanograms in the stomach context. The Pacific Toxicology Lab detected a concentration level of 329, and that was actually remarked upon during the trial when they asked the expert, well, do you consider that to be a significant difference? And his response was, that's a big difference. Those were his words. So that's the third reason. The fourth reason is that you had someone who was involved in the investigation here, specifically someone who was given the responsibility to determine whether or not there was fentanyl missing from the lab, who was not necessarily an objective independent observer, and that is the person who did not get the head lab position because of the alleged co-conspirator getting that job in his place. So he was someone who at least potentially had a bias and was not someone who should have been in a position of making a determination of whether there was fentanyl missing. And the fifth reason why in these circumstances a lawyer would have a duty to investigate and be on notice of that is because the defendant, Ms. Rossum, told her lawyer and told the police, I had clonazepam and oxycodone in the house, and I think my husband may have taken those. What she never said and what is otherwise inexplicable is how he would have gotten the fentanyl. And I'm not saying that just because something is implausible you need to investigate it, but certainly when you take into account all the other factors, the absence of any other explanation of how fentanyl would have gotten into the household so the husband could have been exposed to it is one that would have warranted an obligation to do an investigation here, at least to have your own forensic testing done of the sample. What was the testimony that was given by the defense expert, Dr. Wallace? Yes. And did that speak to this at all? No. I think they called Dr. Wallace primarily for the issue of whether or not there was a smell to fentanyl. And the reason they did that was because there was a suggestion that he might have swallowed the fentanyl. And there was testimony on direct where they tried to get Dr. Stanley to admit that fentanyl does have a bitter taste to it. He was unwilling to admit that in small quantities that it had a smell. He did indicate that once you got to a certain level it might have a detectable smell. But Dr. Wallace really was called for the question of whether or not there was a smell to it and otherwise was really not prepared to answer anything. And I think that the prosecution actually was able to turn him into their witness almost by getting into the issue that I think the defense should have explored here, which is can you explain to us how it's possible that someone could have self-administered these drugs. And he was unable to answer that question, essentially. Because wasn't, I mean, essentially the theory of the defense was that this had been a suicide. And that theory was flat-out contradicted by the fentanyl stuff. And so to some degree not examining the fentanyl issue was opening yourself wide open to having the suicide theory blown away. Right? Precisely, Judge Gertner. And that's in fact what happened during the closing argument when the prosecutor stood up and said, how could you self-administer this much fentanyl? You'd be dead before it got to 57 nanograms. So that's exactly right. That's exactly right. Clarifying. You had given, you were going to give six reasons. I've noted five. Had you finished? The sixth reason, Judge Reinhart, was that they sent it out to three different labs. And that just seemed to me to be a peculiar circumstance. In and of itself, it probably is the least important factor. But there's something atypical when they themselves feel the need to send it out to three labs. And in conjunction with that, you then get back varying levels from those three labs. Well, would you clarify something for me? In your brief, you argue the government improperly raised for the first time on appeal the argument that maybe the autopsy specimens were actually tested for metabolites. I'm looking at the district court docket 8-1, page 15, and it looks to me that they raised this before the district court. Am I missing something here in the record? I would trust your judgment over mine on that, Judge Nelson. If I said that and they did raise it below, then I'm mistaken. I do think, nevertheless, that our position always was that we wanted an evidentiary hearing. And one of the things we would have been able to introduce at the evidentiary hearing was proof that they were not ever tested by the defense. Because once the samples come back from the labs, there is no further break in the chain of custody. And if you look at the clerk's transcript from the state court, which I believe is available to you and was submitted as part of the record on appeal, there is no indication that there was ever a request by the defense to get access to the forensic evidence to be able to do testing. So I would submit the absence of that is sufficient at least to give me an opportunity to have an evidentiary hearing where I could prove that fact. We alleged it, and I think we would be able to prove that without any question if we had a hearing. And for that same reason, I think that we should have been, I mean, I think that Dr. Richmire's declaration establishes that there was prejudice because it undermines confidence in the outcome. But even if you were not convinced that the record establishes prejudice, I do believe that under Rule 6, we should have been granted the opportunity to conduct discovery. And on that particular question, I think the district court essentially relied on the wrong authority. The court relied on Osborne, which is a pre-petition case. And this was, in fact, a case in which we'd filed a petition in Rule 6 governance, and all we had to do was establish good cause, and I think we did that sufficiently to be able to conduct the test. And with that, I would reserve the rest of my time for rebuttal unless the President would like to. Well, we'll give you two minutes for rebuttal. I have one more question for you. Aside from the discovery on the fentanyl, what about issues such as what the standard of practice is at the time, how it came about that the lawyer didn't ask for this investigation? Is the lawyer still alive? I believe that both of the defense lawyers are still alive. That's correct.  I'm not sure if the second one has retired, but I believe that they're both alive. And I assume there were no affidavits from either of the lawyers at the hearing? There were no affidavits submitted by the lawyers, Your Honor. And I believe that under this Court's case law, a lawyer is not supposed to confess to his own incompetence, and that raises the question of whether or not you have an obligation then to report the person to the State Bar. So it's very problematic for someone like myself to get a lawyer to admit in a declaration that they've been ineffective because essentially they're jeopardizing their license. So I think the absence of a declaration is something that would have been addressed if we'd been given an opportunity for a hearing. Does that mean that if you had a hearing, you would not seek to obtain evidence from those lawyers? Oh, I absolutely would, Your Honor. I absolutely would. I think that unless I had them in a situation where I could actually require that they respond to questions, that they would reasonably decline to provide me with any information that was helpful since they no longer have a duty, given that they have the self-defense privilege under the waiver doctrine. And what do you think you need to establish in order to get an evidentiary hearing? A plausible, factual series of allegations that would entitle Ms. Rossen to relief. An evidentiary hearing under EDPA, is that what you're suggesting? I'm sorry, under? Under, as on a habeas standard. Yes, that's right. That's right. But now, was there any downside to seeking to test these samples for metabolites? No, Judge Gertner. In fact, the State does not posit one plausible strategic reason why you wouldn't have done this in the discussion. Because either they were there, in which case it would have disproved the government's case, or they were not, in which case it would have made her defense plausible. That's correct. That's exactly right. And you're familiar with Richter, I assume. I am, Your Honor. And I actually submitted a Rule 28J letter. I cited it in my brief and I note it in my 28J letter. But I don't think that it really impacts the questions that are before me. No matter what the Court does in Richter, it won't affect your? I don't. The question granted as to the ineffectuousness of counsel claim is so narrow that I don't think that it affects me. There's a second question that the Court itself added when they granted search, which has to do with the standard that applies where there's a summary disposition. And I would think that how the Court answers that question certainly would have an impact on that argument that I make in my brief. But, again, I don't think we need to reset in order to still be entitled to prevail, because I think we even meet the unreasonable standard under existing law. Thank you. Thank you. Good morning, Your Honor. May it please the Court, Deputy Attorney General Kyle McKee Schaefer, on behalf of Respondent Apelli. Your Honors, Appellant Kristen Rossum did receive the effective assistance of counsel in this case, as the district court correctly concluded. Let me ask you outright. Certainly. This was a no-risk proposition here, it seems to me. And what would the standard be here for effectiveness of counsel? If he had these tested, I think nothing could have hurt the case and something could have helped him considerably, the counsel. So what should the standard be here for an effective counsel? Well, Your Honor, the standard is the Strickland standard. And, of course, that is a two-pronged test, whether or not a reasonably competent attorney would have sought to have the metabolite or testing done in this case, and whether or not Ms. Rossum could show prejudice from the fact that the testing may not have been done. However, as is discussed in the briefing, Your Honor, there is no clear showing that the testing was not already done in this case. The parties stipulated to the lab results, so the actual reports themselves were not introduced into evidence in this case. Rather, just a stipulation concerning the results was read to the jury. And, in fact, the defense expert who submitted a declaration in support of this petition did not, Dr. Reichmeier did not review the actual lab reports. Instead, he merely reviewed the stipulation that was entered. So this record is sufficient to establish that testing for metabolites in the fentanyl was done? No, Your Honor. I'm saying it's not sufficient to establish that it has not already been done. But if the standard of reasonable, the standard of care, for want of a better word, for counsel is to have done this, aren't you conceding then that there at least should be discovery on the question of whether it was done? No, Your Honor. And I'm not conceding that the standard of care would involve a request for this testing in the first place, let alone that the alleged failure to test established the prejudice required under Strickland. I'd like to point out a couple of things on this issue, since it appears to be the one the Court is particularly interested in. I notice that Dr. Reichmeier's declaration does not indicate any alternative cause of death in this case. And we know, in fact, that something killed this very healthy 26-year-old man. There were only three drugs found in the Chamin system, a trace of oxycodone, a therapeutic dose of clonazepam, and the elephant in the room, fentanyl. We know that neither oxycodone nor clonazepam could have killed this healthy young man. So that goes to the prejudice aspect that Ms. Rossman would have an extremely difficult time showing, prejudice for failing to test in these circumstances. I'd also like to point out, Your Honor, something that I did not discuss directly in the briefing. However, the toxicologist who testified in this case from the Pacific Labs, Michael Hansen, and his testimony is included at the excerpts of record, actually in Volume 2, at Excerpt 305. And defense counsel did question Mr. Hansen concerning the possibility that somebody might have contaminated the autopsy specimens before they had been tested by Pacific Laboratory, which was the first of the outside labs to test. And Mr. Hansen said, well, there's no way that we would be able to detect that in this case. So the implication being that, in fact, either the metabolites had already been tested for or Mr. Hansen is flatly disagreeing with Dr. Ogmeier in saying that, regardless, there would be no way to establish whether or not the metabolites had been tested for. But again, again, we go to what killed Greg Billers. It's not a mystery in this case, Your Honor, and it wasn't a mystery to defense counsel either. And, in fact, defense counsel's best opportunity, his shot at the buzzer, so to speak, was to advance the theory that this young man despondent over his wife's extramarital affair and desire to leave the marriage, that he committed suicide. But wasn't the government's own theory somehow internally inconsistent? In other words, the fentanyl on the one hand, and the dosage of fentanyl found in this man's body was somehow inconsistent with the liquids that were found, urine as well as I think it was in the lungs, that suggested that either he had died immediately, given the dosage of the fentanyl, in which case you wouldn't have had this kind of fluid, or he died over a period of time in which case the amounts would not have been that high. I mean, there was an internal inconsistency between the bodily fluids issue and the fentanyl dosage. So being able to suggest that the fentanyl wasn't the cause, at the very least could put reasonable doubt in the government's case. Well, no, Your Honor, I don't think there was an inconsistency in the government's case. There is an obvious lack of direct evidence as to how appellant administered fentanyl in its various forms to her husband. The expert testimony in this case established that the fentanyl was administered through a number, probably a number of different mechanisms, and that the different administrations, the different doses and the different types of administration accounted for the unusual lab outcomes in this case. However, as we note in the record, three different independent labs did test the autopsy specimens in this case. Although there were differences in the outcomes of those lab reports, both Dr. Stanley and Dr. Blackburn testified that those differences were within the norm of laboratory reports, sampling and error, and that they were not significant. So there was no inconsistency in this case. There's just perhaps what Your Honor is referencing is Dr. Reichmeier, the defense expert, who basically says the victim's levels were so high that contamination must be because he would have died immediately and therefore there wouldn't be this kind of fluid in his body. Correct, Your Honor. And again, that's a statement by a defense expert, not the prosecution. But as the district court correctly found, Your Honor, the declaration by Dr. Reichmeier failed to take into account the possibility of multiple administrations of fentanyl in its various forms. And Dr. Reichmeier's declaration indicates he is not familiar with significant portions of the record. We're talking about an ineffective assistance of counsel claim. Doesn't that give you pause to begin with? The defense expert is not familiar with significant portions of the record and not able to answer questions? Well, Your Honor, he was retained by current counsel. He was not retained by trial counsel. So if the issue here is solely the alleged ineffective assistance of trial counsel who had nothing to do with Dr. Reichmeier. So there was no – in the trial court, Your Honor, the theory was solely that Mr. DeVillers had committed suicide. And I would like to add, Your Honors, that that testimony was consistent with the statements given by Ms. Rossum at various times to various personnel. From the minute the paramedics arrived at her home the night Greg died, she stated that she believed her husband had taken some of her old medications and that this was a suicide. Let me just ask you a question. Would you concede that if the tests were taken and no fentanyl showed up, that the prosecution would have no case? Well, Your Honor, we wouldn't know what the cause of death is. So you're assuming all of the different labs had tested and there had been no fentanyl at all show up in any? The fentanyl metabolites. In other words, if the samples had disclosed fentanyl metabolites, then that would have suggested that it had been in his body. If there were no metabolites, then it would have suggested that it had been external to him and not in his body at all. And if it were the latter, then the lab results would be irrelevant because it would have meant that the fentanyl had nothing to do with his death. Well, Your Honor, again, we don't know whether or not that testing has been conducted. We do know from the record that the toxicologist who did actually test the specimens does not believe there would be a way to determine whether or not the samples had been contaminated. However, in the scenario that no fentanyl had shown up at all, we would not have a cause of death. In this case, however, obviously that was not what the testing resulted. I take it Your Honor's question had to do with the metabolites rather than the fentanyl itself. Yes, but the real question goes back to the ineffective assistance of the council and the risks that it would have taken to have that test made. And if it showed nothing at all, that could have been to the advantage of the defendant. If it showed some, it would not necessarily have hurt the case at all. I mean, it's a question of what risk was there in having those tests made, which goes to whether or not he should have had those tests made. Well, Your Honor, again, it does not appear that any reasonable council would have sought to have those tests given the state of the evidence in this case. In fact, as I pointed out, Your Honor, the toxicologist who actually tested the specimens themselves did state on the record that there would have been no way to determine whether or not the samples had been contaminated. Given that state of the evidence, it seems that no reasonable council would have sought to pursue a contamination theory. I take Your Honor's point, what would have been the harm. But, Your Honor, there's all kinds of different tests that probably could have been done, and the harm might not have been real, but what would have been the good, I guess, maybe is the way I would look at it, Your Honor. What would have been the point? Well, if the test showed no fentanyl at all, that would have been a great assistance to the defendant. Yes, if it showed no fentanyl. The metabolites, though, would not have established whether or not this defendant killed her husband through some other mechanism. We know that she was alone with him for, I think, over 24 hours during the period before he died. No one else had access to him or even spoke to him during that time. Are you suggesting this, and I may have missed this in the record, that there was testimony that there was no way to determine whether there were metabolites in the fentanyl, that that test could not have been done? No, Your Honor. The purpose of conducting that test, as I take it from Dr. Rockmeier's declaration, would be to pursue a contamination theory. Right. Well, the toxicologist who did testify in this case testified that there would have been no way to determine whether the samples had been spiked or contaminated. But why? In other words, if the test would be the presence or absence of metabolites in the sample, metabolites suggesting that it had come from the victim's body, the absence of metabolites suggesting it had come from a shelf. So is the state of the record that that is an impossible test to determine whether there were metabolites present or not? No, Your Honor. The testimony from Mr. Hansen does not say anything about the metabolites. Well, but it does say there's no way to determine. That's right, Your Honor. It does say that. And I think a reasonable interpretation of that testimony could be that, in fact, the testing has already been conducted and did not reveal anything. Yeah, other than he doesn't know about metabolites. Well, he is a toxicologist, Your Honor, so given him the benefit of the doubt, it's hopeful that he does know that. Maybe he's an ineffective test. An effective toxicologist, well, that's out of my area, Your Honor. But we do know, in fact, that Dr. Reitmar does say that many labs commonly do test for metabolites. So, you know, given that combined with Mr. Hansen's testimony, there's some inference that either the testing was already conducted and proved non-helpful or the testing – because, after all, counsel did stipulate to the lab results in this case, three of them. So there's some suggestion there that there was no reason to pursue a – Well, the lab results don't tell you anything other than that the sample they tested. Well, they might have tested for metabolites, Your Honor. I think that's what Dr. Reitmar's declaration goes to is he says, well, many labs commonly do test for that, and whether or not the metabolites were present might have been illustrative in some way. But he did not review the actual lab results themselves. He just reviewed the stipulation. So there's not in this record – the actual lab results themselves are not in this record, and that's why it is not entirely possible to state one way or another. However, the indicators appear to be fairly strong that either the testing was, in fact, already conducted by the three labs that looked at the autopsy specimens or that it was conducted and the results were not favorable to pursuing a contamination theory. And I would just like to – I see my time is up, Your Honor, if I might have just one second to – Before you get to one second, you said that we know the other drugs could not have killed the defendant's husband? No, Your Honor, there was unequivocal testimony to that effect by Dr. Blackburn, who said that the oxycodone found in Mr. de Villa's system was a mere trace, and the clonazepam was a high therapeutic amount, but not fatal. So – You don't know what the state of the evidence would have been if fentanyl were excluded from the picture because of the testing problem. Obviously, I mean, you don't – that's a speculative question. You don't know what they – they would have looked for something else. Well, Your Honor, I think they ran a very comprehensive screening on the specimens in this case, and I cannot say what all they did look for, but – Let me just also just – what is your answer to counsel's point that, at the very least, aside from the role of fentanyl in the suicide theory and aside from the relationship between the fentanyl and the body fluids, when you have a substance that was essentially – that was delayed from getting from the lab to the testing – that there was no contamination? Well, it was capable – the specimens were capable of being accessed, but only by a very few number of people. Those were all employees of the medical examiner's office who had keys to the office. It was sufficiently compromised that the medical examiner's office wasn't going to do the lab testing in this case.  The victim was a relative of an employee of the medical examiner's office. That was the reason the testing was not going to be conducted. Well, that's the reason that the fact that it was only employees of that office doesn't carry the same weight it would in an ordinary case. Correct, Your Honor, but there's no indicator in the record here, as noted by the district court, that anybody in that office had any motivation whatsoever to contaminate the autopsy specimens that were briefly stored at the medical examiner's office. I would like to just – Go ahead. Your Honor, I'm sorry, but I – I know you wanted to close with something. Well, I had a point I think I neglected to make earlier, and that is that Strickland does allow counsel to reasonably rely on information that is given to him by his own client. And in this case, his own client, Ms. Rossum, did tell counsel that she believed her husband voluntarily ingested clonazepam, oxycodone, and fentanyl, and she believed he had taken her old prescriptions on the first two drugs. As to the fentanyl, she believed that her husband had removed the drug from the medical examiner's office when he had visited her there, which he frequently did while she was employed. So the defendant herself provided the ammunition for why this theory was pursued as a suicide. But that was after she was told, wasn't it, that he had died from that? Yes, Your Honor. She was looking for an explanation as to how he might have gotten it. Well, correct, Your Honor, I suppose – And she didn't know that he had done it then. She was speculating that if he had died from that, that must be how he got it. Well, I think she did know, Your Honor. I think she very well knew. I think she very well knew how her husband died, and I think she's the only one who did. But I think that in trying to explain the suicide theory when the fentanyl showed up, much to her chagrin, she had to come up with an explanation as to how he could have accessed that drug. And, in fact, she did give one that was within the realm of plausibility and is why counsel's reliance on a suicide theory was an exercise of effective assistance within the parameters of Strickland. If the Court has no further questions, I'll submit the matter. Thank you very much. Thank you, counsel. Thank you. I just have a few brief points. First of all, Judge Reinhart, you're correct. She never mentioned fentanyl until after she was told that that was the cause of death. The question about the toxicologist's testimony that you couldn't determine whether or not there was anything added to the samples, I would submit that he has asked the wrong question. If you look at the excerpts of record on page 305, it actually begins on line 7. He's asked, do you have, and this is the gentleman from one of the labs that did the testing, he said, do you have any way of knowing or testing to determine if any sample sent to you by, for example, Mr. Barnhart and the sheriff's office has been tampered with or spiked by anybody? And he says, no. And then he goes on to say, so conceivably then someone could have added fentanyl to the samples or could add more fentanyl to the samples, let me read it correctly, to the samples that are drawn from the body and then sent it to you for testing. Is that correct? Yes. And there's no way you would be able to detect that? No. The question asked of him was, could you determine whether or not this had been added after the fact? The question should have been, is there any way to determine whether or not these drugs were processed through his body? Because there isn't a way to really tell whether or not it was added after the fact, but you can determine conclusively whether it was processed by the body by testing for whether they're metabolized. And that would give you the answer there. So that testimony does not in any way impact our claim. The two other points that I wanted to address were, first of all, Dr. Richheimer, who was the expert in the post-conviction phase, did have access to all of the testimony that the jury was provided about the fentanyl. So he was in the same position that a juror would have been and opined based on his great degree of experience. The final point is that both in the closing argument and also in the district court, in trying to come up with theories about, to sort of explain why the lawyer didn't have a duty to do this investigation, posited that it is possible that the clonazepam and oxycodone could have been a fatal dose. Because remember, they have a synergistic effect, and there's post-mortem redistribution. So the levels found at the time the autopsy was done are going to necessarily be lower than they were at the time of the cause of death. So they go down. And also the clonazepam has a sort of enhancing effect on the opiate, on the oxycodone, and there's testimony about that. And that was why, even though those levels when they were tested were not necessarily lethal, they may well have been at the time that the death occurred. With that, I would submit. Thank you. Thank you. All right. The case just argued is submitted. Thank you both very much. And the Court will stand in recess for the morning.
judges: Gertner, Nelson D. W., Reinhardt